Good morning. May it please the Court, Deputy Attorney General Nicky Schaefer for appellant and respondent. With the Court's permission, I would like to reserve two minutes of my time for rebuttal. Thank you. Your Honor, the District Court erred in granting habeas relief in this case. The State Court's conclusions and findings were neither contrary to nor an unreasonable application of United States Supreme Court precedent or the facts established by the evidence presented in the trial court. The District Court's reliance on this Court's opinion in Randolph was misplaced. First of all, of course, Randolph is not United States Supreme Court precedent. Secondly, the petition in Randolph was filed prior to the enactment of the Anti-Terrorism and Effective Death Penalty Act and thus this Court evaluated Randolph's claims under the less deferential standard of review that was applicable at that time. Let's sort of jump right to it since we don't have a lot of time. In my mind, this pretty much resolves on the AEDPA standard of review. Tell me what the State factual findings were regarding the woman coming in and getting the tape recording. I mean, what factual findings do we have from the State Court there? Yes, Your Honor, the woman's name in this case was Ms. Camalinga and all of the State Courts did specifically conclude that she was not acting as an agent of the State at the time she recorded Petitioner's statements in this case. The State Courts found that Ms. Camalinga went to the police as a private citizen. She plainly was not Petitioner's co-defendant or a jailhouse snitch and it's undisputed here that the reason she went to the police was solely because she was afraid for her life and the lives of her daughters. Weren't there other ways that the police could have dealt with that other than giving her a tape recorder and asking her to record conversations with Mr. Lewis? Well, Your Honor, there... Mr. Martin? Yes. Yes, Your Honor. There might have been alternative methods the police could have used. However, there was no proof at this time that Ms. Camalinga was in fact being threatened and what the officers did in this case was reasonable and, of course, that's the decision of this Court. What if they hoped to get information, you know, they hoped to get him to confess about the murder? She already told him, you know, obviously she already told them that he had told her he had killed the man in Mexico and then also, is it Mr. Ramon? Mr. Ramon was the victim in this case, Your Honor. Right. And then the man in Mexico as well. Yes. And so she would be able to testify at trial in any event as to admissions that he had made to her. So what if the intent of the police was not really to record the threats but to get him to say things about the murder? What factual findings do we have about that? Because there's two ways in my... You know, you could look at it from the standpoint that you could look at it and say, well, yeah, she did come in. That's pretty much undisputed. She said she was getting threatened and she figured she would be next and they said, well, you need to record the threats. But clearly he had already been arrested for the murder. He already had a lawyer. And so if the state court, say, had found, well, I find that, yeah, she did come in that way, but my primary purpose was I saw an opportunity to get recordings and hopefully then she could, you know, it will touch on the murder and then, you know, it's a win-win situation. Well, that's, of course, not what the state courts did find in this case. Okay. So what did they find given those facts? They found, Your Honor, that the state did nothing more in this case than provide Ms. Camalinga with a tape recorder and tell her to turn it on whenever a petitioner called her. They specifically, the state courts all specifically found that there were no instructions beyond turn on the tape recorder when he called. So this was not a... Any findings about what the police hoped to get out of this? Your Honor, there were not, but it is irrelevant in this case what the police officer's subjective wishes or desires may have been, Your Honor. It's probably true, Your Honor, that they did, in fact, hope that the petitioner would make incriminating statements. But that is not why Ms. Camalinga was given the recorder in this case, nor is it why she turned it on when petitioner called her in this case. Well, Counsel, it seems to me that what you're saying and what you need to persuade me of is that the analysis that the district court chooses not to follow is the traditional analysis of agency. Was, you know, this person acting as an agent of the police? And all of the factors that you've cited go to the question that she was not. What the district court appears to have said is, I'm not interested in that. I'm going to look at the purpose of Maasai, and the purpose of Maasai is that the government may not deliberately solicit statements from the defendant or the accused. And under that standard, she properly reversed this. So persuade me that that's not the test that we should apply, that we should look at this under an agency analysis. Well, the district court erred, Your Honor. The district court's reliance on Randolph was misplaced because in Randolph, the focus of the case. Tell me about Maasai. I understand about Randolph. Oh, okay. Well, Your Honor, in this case, first of all, the United States Supreme Court has never spoken on a bright-line definition of what constitutes agency for purposes of someone acting as a government agent. For purposes of my question, I will concede that you may be right under agency. I want to know if the government intentionally sets up a situation where they're going to get statements from an accused, isn't that a violation of his constitutional rights? That would be, Your Honor, but that's not what happened here. The evidence in this case was unequivocally that she was not told to ask Petitioner any questions. And, in fact, she testified that she was not trying to elicit his confession to murder. But the police at that point knew that one of the things that had come up in these conversations previously had been that he killed people, and specifically some of the defendants in this case. That was part of the threats. Yes, Your Honor. And so they know that at the time that they give the recording device to her. Yes, they knew that. And it undoubtedly was part of Ms. Camalinga's genuine fear of Petitioner that she, too, knew that he had arranged for two men close to her to be murdered. However, the facts in this case plainly indicate that she was not trying to elicit a confession to murder, nor was she told to do so by the police in this case. And under Henry, the United States Supreme Court President in this case, in that case, which is as close as we come to a Supreme Court finding about what constitutes an agent, the snitch in that case, Your Honor, for lack of a better term, was acting pursuant to specific instructions by the officers that were not present in this case. That seems to be, Your Honors, from what we can glean from the United States Supreme Court authority, the most pertinent factor is, was the snitch or co-defendant acting pursuant to instructions of the police? There's another important distinction, too, is there in Henry the crime was already over, and they're trying to build the case. In this case, this lady calls up the police and says, I'm being threatened right now. There's a brand-new open problem now that the police have to deal with. Yes, Your Honor, and that's a... They can tell her to hide under the desk, or they can tell her to leave town, or they can tell her to, if he calls you again, try to capture it on tape. Well, yes, and plainly had they told her to hide under the desk, that would have been an abdication of their duties to protect the safety of the public. Isn't that the main distinction, though, between Henry and Messiah in our situation, that there's a new ongoing, currently going-on crime? Yes, Your Honor, and that gets to another argument we'd like to make, that, in fact, if she was acting as an agent at all in this case, Your Honor, she was acting as an agent for purposes of investigating the new crime, that being witness intimidation. She was not acting as an agent for purposes of investigating the murder of the victim in this case, Your Honor. You've got about a minute and a half left, and you said you wanted to reserve some time. Oh, thank you, Your Honor. Thank you. May it please Your Honors, Donald Marks for the appellee. Good morning. Good morning, Your Honors. If I may address initially some of the points raised by the Court with respect to agency, I think what happened here is that the district court did not look to traditional analysis of agency. It looked at the cases. It looked at Malton, looked at Henry, and it looked at Messiah. And it said that an agent does not have to be compensated, although I might say in this case this agent was because this agent was promised witness protection program and did go into the witness protection program. And under Henry, this witness, this informant received a benefit, not money, but a benefit, and maybe money. We don't know. So this whole Randolph issue should be set aside, Your Honors, because at best there's no argument under Randolph since this informant was, in fact, compensated. What should the police have done? This lady called up the police and says, I'm scared of this guy. He's killed other people. Now he's threatening me. What should they have done? What the police should have done, Your Honor, what the DA should have done is go in, in camera, under seal with a declaration from Ms. Camalinga that she's been threatened. And what would have happened is that the bail of my client would have been revoked, he would have been arrested, and he would have been remanded. Very simple. He says, I didn't threaten her. She says, he did threaten me. He would be saying that while he's in custody, Your Honor. Well, what makes you think they would revoke him if he denies it? I think the declaration of a principal witness in this case would have been sufficient for a Superior Court judge to terminate and revoke the bail in this case. I have no doubt about that. That's what would have happened here. The DA did not take that route. Instead, under the guise of investigating an intimidation of a witness, which is serious, but no comparison to a murder charge, after all. Well, it depends on who you're talking about. If you're the person that's being threatened to be killed, that's kind of important to you. And that's exactly why the reason, Your Honor, that the DA should have moved immediately and gone into court under seal, in camera, and asked for remand, for a remand into custody of the defendant in this case. A lawyer like you wouldn't have gone in there and said, that's just her story. I would have done that, Your Honor. So that's why the police say, let's get her on tape. And I would have lost, Your Honor. Well, maybe you wouldn't have. Because, with all due respect, Your Honor, a Superior Court judge would not take the chance that a principal witness, under penalty of perjury, is saying, I've been threatened. That would be sufficient, as far as I'm concerned. If you win today, I want to make sure I understand what the rule would be. The rule would be, if a witness in a pending case calls the police and says, I've been threatened, the police cannot say to her, if he calls you back, try to capture it on tape. What they should have done, Your Honor. No, no. What they should have done is, first of all, seek a remand of this defendant. Okay, but can they tell her, if he calls you back, capture it on tape? No, they cannot say that. What they can say, at the maximum, and I'm not sure that this is even sufficient, is do not speak to him about the facts of this case, about the murder charge, because that's what he has a right to counsel for, and you can't do that in the absence of counsel. Okay, but they can't make her an agent. But how can, you know, I mean, how could you tell anyone that has nothing to do with it, you can't talk about a certain subject? Well, they couldn't say it here, Your Honor, because to prove the threats, you have to prove the murder. Because she was telling Detective Wolf that by telling me, this is what the informant is saying, by telling me about these two murders, he's really saying to me that I'm next and my daughter's the next. So to prove the threats in this case, and Detective Wolf knew this, very experienced homicide investigator, he knew to prove those threats, Ms. Kamalinga would have to go into the murders, because that was the basis of the threats. Counsel, I'm having a lot of trouble with your principle, though. It seems to me that here we have an apparent boyfriend-girlfriend relationship. It should be a fairly major question that he's under indictment and pending charges, and you want us to establish the rule that in that circumstance when he raises the subject, she goes, oh, I don't think I want to talk about that. That's going to point out the fact that there's something going on and put her in even greater danger. Well, I'm not in favor of all of violating the sign, I think it was. I don't think for a minute Detective Wolf should have given her recording equipment with no instructions and told her to turn it on when the defendant starts speaking to you. I think that is a clear violation of Messiah. Moulton says you just have to create a situation where it's likely, where you know, or you should know that incriminating statements are going to be elicited. Henry says that it's the context in which the informant and the defendant are interacting rather than specific knowledge on the part of the police at that time. All the cases indicate that if you in fact create the environment so that the informant is going to elicit incriminating statements, you have violated Messiah because you have directly and explicitly obtained incriminating statements from that defendant. It makes no difference whether he calls her. That he initiates the conversation makes no difference that he picks up the phone and calls her. I believe Moulton and Henry make no distinction if the accused calls or it's instigated by the informant. They make no distinction. Henry says it's not the government's intent that's important. It's what's likely the result of the government acts. Maine v. Moulton says if you must have known, like Detective Wolfe knew, he knew that there would be discussions about the murder, not about intimidation. He knew there would be discussions about the murder. While I'm the attorney erected preparing for a murder case, he's recording my client talking about the murder because he knows going in to talk about the threats, you've got to talk about the murder. That's the problem in this case. You cannot record my client without finding out about the murders. It's not separate and distinct from intimidation. I'd be all for you if they said call him up and try to get him to talk about the murders. What they said instead was if he calls you, turn on the machine. Don't initiate a call, but if he calls you, turn the machine on. What Detective Wolfe should have done if he was doing this, and I don't sanction what he did, what he should have done at least is to say to Ms. Kamalinga, do not discuss this case, this murder case. Do not discuss it. Get away from any areas where you discuss it. Now, he couldn't do that because what she said to him basically was that he's not making wild threats. He's going to do this. He's going to do that. He's going to come to my house. He's going to take me away. He's not saying that. What she said he said is that by telling her about the two murders, there was an implicit threat that she would be next and the kids would be next, and that's why Detective Wolfe couldn't say that to her because he knew they were intertwined, and by having her turn on the machine, she would talk about the murders, and that's the problem, and you have here very aggressive interrogation. You read these transcripts. It is amazing how masterly this woman was. She's talking about motive. She's talking about the same bullet used in both cases. She's talking about did you leave the body there? What time did you leave? You got to my house at a certain time. He made the mistake of calling the wrong person. Well, but this was aggressive interrogation by an agent of the government. That's what happened here while I was attorney of record awaiting a murder case. They already knew that she could testify, according to her, that he admitted and confessed to the crimes. They didn't have to do this. They could have arrested him for intimidation, and, Your Honor, that's what happened here anyhow. What happened here is that he was arrested and he was remanded. Was there any suggestion that the police put her up to what you describe as this aggressive interrogation? There's nothing in the record, but I think they knew because they had spoken to her on several occasions that this was a very sophisticated lady who knew how to ask questions. They had to know that because they didn't have to give her any instructions. Apparently she knew exactly what to do, and this was highly prejudicial. This is a case where the forensic evidence is nonexistent, where no one knows what happened at the location where the crime took place. Only two people, the accused, if he was there, and the victim. And this tape is what changed the whole case around. And I can make that statement because I tried the case. With that, I'll submit. Mr. Marks, thank you very much. Thank you. Your Honors, just for a point of clarification, counsel's argument seems to be that the threats that Petitioner made to Ms. Camalinga were necessarily entwined with the discussion of the murder or murders that he had committed in this case. But the record specifically indicates that that's not entirely true, Your Honors. At the excerpts of record, page 41, Ms. Camalinga testified that he had repeatedly told her wherever she would go, he would bring her back again, and that she should think about her daughters before she leaves because her daughters would be with her when she died. So obviously threats were being made to her that did not relate to the murder of Mr. Ramone in this case. What do you make of Mr. Marks' point that even if it's not a problem giving her the machine and telling him to turn it on, what they should have done is given her better instructions about what to do and what not to do? They didn't give her any instructions in this case, Your Honors. That's what I'm saying. They should have instructed her just be all ears, don't try to draw him out, don't ask him about the murders. Well, I'm sure we'd be in the same court and he'd be making the same argument had they done so. However, he concedes that there were no instructions given, and plainly there can be no messiah violation in this case given the facts that were present in this case. The petitioner has also failed to address or rebut the state court's reasonable conclusion that the police were investigating a new crime when they furnished Ms. Camelenga with the recording equipment and that his Sixth Amendment rights are not attached to that crime. Thank you very much. Thank you very much, Your Honors. Mr. Marks, thank you. The case has started. You may submit it.
judges: Silverman, Callahan, Robart